# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
January 20, 2012

No. 10-20876

Lyle W. Cayce
Clerk

NANON McKEWN WILLIAMS

Petitioner-Appellee

v.

RICK THALER, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division

Respondent-Appellant

Appeal from the United States District Court for the
Southern District of Texas, Houston Division
4:03-CV-1508

Before JONES, Chief Judge, DAVIS, and DeMOSS, Circuit Judges.

PER CURIAM:[*]

Appellant Rick Thaler appeals the district court's grant of appellee Nanon McKwel Williams' writ of habeas corpus based on his claim that he received ineffective assistance of counsel during his trial for murder, a claim that was previously litigated in Texas state court. Because we cannot conclude that there

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-20876

was no reasonable basis for the state court's denial of Williams' habeas petition, we reverse the district court's grant of relief.

I.

In a previous appeal, this court detailed the facts of this case as follows:

> On May 13, 1992, Williams, his friend Vaal Guevara, and Guevara's friend Elaine Winn, went to Adonius Collier's apartment to arrange a drug transaction. Collier, his friend Ammade Rasul, and Rasul's girlfriend, Stephanie Anderson, met with Williams, Guevara, and Winn. They agreed to complete the transaction at a nearby park. The participants all went to the park in several vehicles. The Government alleged at trial that Williams carried a .25-caliber pistol and a shotgun hidden in his clothing while Guevara carried a .22-caliber pistol. Upon arriving at the park, Williams, Guevara, Rasul, and Collier went into the woods to conduct the drug transaction. The remaining participants stayed in the cars.
>
> During the course of the drug transaction, gunfire erupted. Rasul testified that Williams shot him once in the face with the pistol and that he suffered a bullet wound in the foot as he ran toward the parking lot. Forensic testimony proffered at trial linked the bullet from Rasul's foot to Williams's .25-caliber pistol. Rasul and Anderson sought medical attention for Rasul's injuries, and Anderson reported the shooting to a Houston police officer. Thereafter, the police investigated the park and found Collier's dead body. Collier had suffered a shotgun wound to the head. The medical examiners who performed Collier's autopsy recovered some shotgun pellets from Collier's cranial cavity and a spent and mutilated bullet, which was marked as "EB-1." Winn, Anderson, and another person, identified at trial only as "Xavier," were present at the park, but the only potential eyewitnesses to the shooting were Collier (the deceased), Rasul, Guevara, and Williams. Williams did not testify. Thus, the only eyewitness testimony at trial came from Rasul and Guevara.
>
> Rasul testified that after Williams shot him, he ran. While running, Rasul heard more shots including, apparently,

2

No. 10-20876

the shot to his foot. Because Rasul ran before Collier was shot, while Guevara stayed behind, Guevera's story and its credibility were very important. Guevara initially testified that he did not fire his gun at all. Later, Guevara testified that he fired his gun in the direction of Collier but did not strike him. Guevara then testified that he ran after Rasul. He stated that he never actually saw Williams shoot Collier, but he heard shotgun fire and saw Collier's feet twitching. Guevara also said that he heard Williams say "no more witnesses" before hearing the shotgun fire.

The "objective" evidence in the case consisted of expert testimony about the ammunition recovered from Collier's head and the cause of Collier's death. The assistant medical examiner for Harris County, Dr. Brown, performed the autopsy. Dr. Brown testified that the shotgun pellets killed Collier and that Collier was still alive when shot with the shotgun. He based this conclusion on the fact that there was a red margin around Collier's bullet wound. According to Dr. Brown, this red margin indicated blood pressure at the time the wound was inflicted. Dr. Brown did not find any evidence of "EB-1" during the autopsy and could not account for its presence, but he admitted that Collier could have been shot with a bullet before the shotgun blast and that the shotgun blast could have then obliterated evidence of a prior bullet wound.

The other expert was a Houston police department criminalist, Robert Baldwin, who specifically testified that the "EB-1" bullet came from a .25-caliber pistol like the one witnesses claimed Williams had carried and not from a .22-caliber pistol like the one Guevara admitted to carrying. Baldwin admitted that he failed to test fire the pistols, but testified unequivocally that his analysis was correct.

Williams's trial counsel, Loretta Muldrow, never sought an independent ballistics test or an independent autopsy or examination of the pathology report. Even after learning that Baldwin had not test fired the pistols in his examination of the ballistics evidence, Muldrow still did not request a continuance to have an independent expert further examine

3

No. 10-20876

> this evidence. Consequently, Baldwin's unrebutted testimony buttressed and gave credibility to Guevara's testimony that he was not Collier's killer. Indeed, throughout the State's case, notably in closing argument, the prosecutor made much of the fact that the jury did not need to decide which shot killed Collier because the objective evidence showed that all shots came from firearms attributable to Williams, not to Guevara.

*Williams v. Quarterman*, 551 F.3d 352, 353–55 (5th Cir. 2008). On July 26, 1995, Williams was convicted of capital murder and sentenced to death. The Texas Court of Criminal Appeals (CCA) affirmed the conviction on direct appeal.

Williams filed a state habeas application, in connection with which a state trial court ordered the prosecution to release its ballistics evidence and Guevara's .22-caliber pistol. Before delivering the evidence to Williams' counsel, the prosecution conducted its own tests which revealed that the Houston Police Department had misidentified EB-1. The post-trial test established that EB-1 was fired from a .22-caliber pistol, not a .25-caliber pistol. Based upon those results, Williams claimed that he was entitled to habeas relief under *Strickland v. Washington*, 466 U.S. 668 (1984). He argued that trial counsel's failure to secure independent ballistics and pathology experts, who he argued would have testified that EB-1 was fired from a .22-caliber weapon, constituted an objectively deficient performance. Williams further argued that he was prejudiced by that lack of evidence, because it would have created doubt as to whether he caused Collier's death. *Ex parte Williams*, No. 634442-A (248th Dist. Ct. 2001).

The state trial court held two evidentiary hearings. Williams presented the new ballistics evidence, including testimony from the Chief Criminalist of the Tarrant County Medical Examiner's Office, Ronald Singer. Ronald Singer testified that Collier had suffered two wounds to the head, one inflicted by a .22-caliber weapon, and one inflicted by a shotgun. Singer stated that EB-1 was

No. 10-20876

easily identifiable as a bullet from a .22-caliber pistol, and that any competent examiner would have been able to identify it as such. *Id.*

Williams also presented testimony and affidavits of Dr. Marc Andrew Krouse, Deputy Chief Medical Examiner of the Tarrant County Medical Examiner's Office. Dr. Krouse examined the autopsy evidence and trial testimony and testified that EB-1 was itself highly likely to have caused fatality. He stated that he did not agree with the conclusion made at trial that the red margin around the bullet wound meant that Collier was alive when shot with the shotgun. Dr. Krouse concluded that it was impossible to tell in which order the firearm wounds had been inflicted, and that if he had performed the original autopsy he would have listed both wounds as causes of death. *Id.*

The prosecution presented the testimony of Smith, who was in the car during the shootings but was not present to testify at trial. Smith testified that he heard a pistol shot and then heard Collier yell "I'm hit," and that he saw Williams standing over Collier and pointing the shotgun at him. *Id.*

The state trial court found, *inter alia*, that Collier was alive when Williams shot him with the shotgun. But the state trial court nevertheless recommended that habeas relief be granted, finding that Williams had proven that trial counsel's failure to obtain independent experts constituted ineffective assistance under the *Strickland* standard. *Id.* The trial court reasoned that if trial counsel had sought out independent expert testimony, the evidence would have "changed the type and strength of cross-examination of Guevara . . . and much of the prosecution's closing argument" and that the jury "would have been presented with favorable and arguably exculpatory evidence." *Id.*

The CCA rejected the state trial court's recommendation in a two-page order, which stated in relevant part: "[W]e do not believe, based on our review of the record presented, that some of the crucial fact findings and the recommendation based, at least in part, on them, are supported by the evidence

5

presented at the evidentiary hearing. Accordingly, after a review of the record with respect to the allegations made by [Williams], and with due consideration of the recommendation made by the trial court, the relief sought is denied." *Ex parte Williams*, No. 46,736-02 (Tex. Crim. App. 2002) (per curiam).

Williams then brought a habeas petition in federal court, making the same *Strickland* claim, among others. The district court presumed the correctness of the factual findings issued by the state trial court, except insofar as those findings were inconsistent with the CCA's denial of state habeas relief. *Williams v. Dretke*, No. H-03-1508 (S.D. Tex. Mar. 29, 2005). The district court concluded that 22 U.S.C. 2254(d) precluded federal habeas relief with respect to the *Strickland* claim concerning omitted expert testimony. The district court issued a Certificate of Appealability with regard to the *Strickland* claim. *Id.*

This court reversed, holding that the district court erred in applying a presumption of correctness to the state-court findings of fact. *Williams v. Quarterman*, 551 F.3d 352, 358 (5th Cir. 2008) The case was remanded to the district court "for a full de novo evidentiary hearing of Williams's ineffective assistance of counsel claims on which the [COA] was granted." *Id.*

The district court held an evidentiary hearing at which two pathology experts testified. *Williams v. Thaler*, 756 F. Supp. 2d 809 (S.D. Tex. 2010). Williams called Dr. Krouse, who had previously testified on his behalf in the state habeas proceedings, and the Director called Dr. Vincent J. M. Di Maio. Dr. Krouse reiterated the findings that he reported in state court, and testified that the amount that Collier bled led him to conclude that Collier did not have blood pressure when he was shot with the shotgun. *Id.* at 822. On cross-examination, Dr. Krouse conceded that he could not definitively conclude whether Collier was alive at the time of the shotgun blast. *Id.* at 823. The prosecution's expert Dr. Maio testified that blood in the tissue surrounding the wound indicated that Collier was alive when hit by the shotgun pellets, and that he would have listed

No. 10-20876

EB-1 as a contributory finding but not as a cause of death. *Id.* On cross-examination, Dr. Maio agreed that a .22 magnum "has a high potential for fatality if you're struck in the head with it." *Id.*

After reviewing the evidence, the district court found that trial counsel's failure to obtain expert testimony regarding ballistics and pathology constituted ineffective assistance of counsel under *Strickland.* The district court therefore granted Williams' habeas application. *Id.* at 828.

## II.

Williams filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), therefore the requirements of the AEDPA apply. The AEDPA generally bars relitigation of claims that have already been adjudicated on the merits by a state court. 28 U.S.C. § 2254(d); *see Premo v. Moore*, 131 S. Ct. 733, 739 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). The statute provides three exceptions to the general relitigation bar. A petitioner may obtain federal habeas relief on a claim that has been litigated in state court if the petitioner can show that the state court's decision was contrary to a federal law that was clearly established in Supreme Court holdings, that the decision was an unreasonable application of such law, or that the decision was based on an unreasonable factual determination. 28 U.S.C. § 2254(d)(1)–(3); *see also Penry v. Johnson*, 543 U.S. 782, 792 (2001).

In reviewing a district court's grant of habeas relief, we review "for clear error with respect to findings of fact and *de novo* for issues of law." *Richardson v. Joslin*, 501 F.3d 415, 418 (5th Cir. 2007). The district court's application of AEDPA is a question of law and is therefore subject to *de novo* review. *Buntion v. Quarterman*, 524 F.3d 664, 670 (5th Cir. 2008).

## III.

No. 10-20876

Williams' *Strickland* claim was adjudicated on the merits in state court. Therefore the sole issue here is whether the decision by the Texas Court of Criminal Appeals was an "objectively unreasonable" application of the clearly established federal law concerning ineffective assistance of counsel. *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).

Section 2254(d) "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (quoting *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)) (internal quotation marks omitted). As the Supreme Court recently held, the standard is meant to be difficult to meet, giving federal courts authority to issue the writ only where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedent." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011); *see also Chester v. Thaler*, 2011 WL 6846746, at *3 (5th Cir. Dec. 20, 2011).

The CCA provided no explanation for its reasoning in denying Williams' *Strickland* claim. That fact does not alter the highly deferential nature of the AEDPA standard. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784. In reviewing a state court habeas decision unsupported by explanation, a federal court must "determine what arguments or theories . . . could have supported the state court's decision," and then ask "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

The *Strickland* standard for ineffective assistance of counsel requires that the petitioner show both that counsel's "representation fell below an objective

standard of reasonableness" and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694. Like AEDPA, *Strickland* establishes a deferential standard. *See Harrington* at 788 ("The standards created by *Strickland* and 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.") (internal citations and quotation marks omitted). Williams must prove both that his counsel's performance was objectively deficient and that his counsel's deficiency prejudiced him, and that no reasonable jurist could conclude otherwise.

It is uncontested here that trial counsel's performance fell below an objective standard of reasonableness. Because of counsel's failure to obtain independent ballistics and forensics experts, Williams could offer no real challenge to the state's argument that he had fired both EB-1 and the shotgun pellets. He was unable to meaningfully challenge the testimony of Vaal Guevara, the only testifying eyewitness. And without ballistic or forensic evidence showing that Guevara fired EB-1, Williams could not make the argument that is now at the crux of the case: that Collier was dead before he was shot with the shotgun.

The remaining issue is whether Williams was prejudiced by his counsel's deficient performance. In assessing prejudice under *Strickland*, the question is whether it is "reasonably likely" the result would have been different if counsel had acted different. Certainly the trial would have proceeded differently if Williams' counsel had obtained independent expert reports. As it was, both sides proceeded on the assumption that Williams fired both shots, which rendered irrelevant the issue of which shot was fatal. If independent experts had testified that Williams did not fire both shots, the defense would have been able to argue that Guevara, not Williams, killed Collier.

No. 10-20876

But the fact that the trial would have been argued differently does not necessarily mean that the outcome would have been different. There was ample evidence showing that Williams shot Collier in the face with a shotgun, and Williams' post-trial expert reports could not conclusively state that Collier was already dead when Williams shot him. None of the expert testimony or reports, either during trial or post-trial, has been able to rule out the shotgun blast as a contributing factor in Collier's death. Post-trial experts disagreed as to the degree to which EB-1 contributed to Collier's death, but none could conclusively state that the .22-caliber weapon was solely responsible.

Whether expert testimony would have led a juror to entertain a reasonable doubt about Williams' guilt, then, is a point on which fairminded jurists could differ. Keeping in mind the highly deferential standard imposed by the AEDPA, we cannot conclude that the CCA's denial of relief was unreasonable. The CCA could have reasonably determined that, even if Williams had been able to show that he did not fire EB-1, the overwhelming evidence that he shot Collier with a shotgun would have led the jury to conclude that he contributed to Collier's death and was therefore guilty of capital murder.

IV.

For the foregoing reasons, we conclude that the CCA's decision was not an unreasonable application of clearly established federal law. Accordingly, we REVERSE the district court's grant of habeas relief to Williams.