# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 19, 2012

No. 10-20876

Lyle W. Cayce
Clerk

NANON McKEWN WILLIAMS

Petitioner-Appellee

v.

RICK THALER, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division

Respondent-Appellant

Appeal from the United States District Court for the
Southern District of Texas, Houston Division

Before JONES, Chief Judge, DAVIS, and DeMOSS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Upon reconsideration, this panel's previous opinion in this case, *Williams v. Thaler*, 459 Fed. Appx. 327 (5th Cir. 2012), is hereby withdrawn in its entirety and replaced with the following.

Appellant Rick Thaler appeals the district court's grant of appellee Nanon McKewn Williams' writ of habeas corpus based on his claim that he received ineffective assistance of counsel during his trial for murder, a claim that was previously litigated in Texas state court. Because we cannot conclude that there was no reasonable basis for the state court's denial of Williams' habeas petition, we reverse the district court's grant of relief.

No. 10-20876

I.

In a previous appeal, this court detailed the facts of this case as follows:

On May 13, 1992, Williams, his friend Vaal Guevara, and Guevara's friend Elaine Winn, went to Adonius Collier's apartment to arrange a drug transaction. Collier, his friend Ammade Rasul, and Rasul's girlfriend, Stephanie Anderson, met with Williams, Guevara, and Winn. They agreed to complete the transaction at a nearby park. The participants all went to the park in several vehicles. The Government alleged at trial that Williams carried a .25-caliber pistol and a shotgun hidden in his clothing while Guevara carried a .22-caliber pistol. Upon arriving at the park, Williams, Guevara, Rasul, and Collier went into the woods to conduct the drug transaction. The remaining participants stayed in the cars.

During the course of the drug transaction, gunfire erupted. Rasul testified that Williams shot him once in the face with the pistol and that he suffered a bullet wound in the foot as he ran toward the parking lot. Forensic testimony proffered at trial linked the bullet from Rasul's foot to Williams's .25-caliber pistol. Rasul and Anderson sought medical attention for Rasul's injuries, and Anderson reported the shooting to a Houston police officer. Thereafter, the police investigated the park and found Collier's dead body. Collier had suffered a shotgun wound to the head. The medical examiners who performed Collier's autopsy recovered some shotgun pellets from Collier's cranial cavity and a spent and mutilated bullet, which was marked as "EB-1." Winn, Anderson, and another person, identified at trial only as "Xavier," were present at the park, but the only potential eyewitnesses to the shooting were Collier (the deceased), Rasul, Guevara, and Williams. Williams did not testify. Thus, the only eyewitness testimony at trial came from Rasul and Guevara.

Rasul testified that after Williams shot him, he ran. While running, Rasul heard more shots including, apparently, the shot to his foot. Because Rasul ran before Collier was shot, while Guevara stayed behind, Guevara's story and its credibility were very important. Guevara initially testified

2

No. 10-20876

that he did not fire his gun at all. Later, Guevara testified that he fired his gun in the direction of Collier but did not strike him. Guevara then testified that he ran after Rasul. He stated that he never actually saw Williams shoot Collier, but he heard shotgun fire and saw Collier's feet twitching. Guevara also said that he heard Williams say "no more witnesses" before hearing the shotgun fire.

The "objective" evidence in the case consisted of expert testimony about the ammunition recovered from Collier's head and the cause of Collier's death. The assistant medical examiner for Harris County, Dr. Brown, performed the autopsy. Dr. Brown testified that the shotgun pellets killed Collier and that Collier was still alive when shot with the shotgun. He based this conclusion on the fact that there was a red margin around Collier's bullet wound. According to Dr. Brown, this red margin indicated blood pressure at the time the wound was inflicted. Dr. Brown did not find any evidence of "EB-1" during the autopsy and could not account for its presence, but he admitted that Collier could have been shot with a bullet before the shotgun blast and that the shotgun blast could have then obliterated evidence of a prior bullet wound.

The other expert was a Houston police department criminalist, Robert Baldwin, who specifically testified that the "EB-1" bullet came from a .25-caliber pistol like the one witnesses claimed Williams had carried and not from a .22-caliber pistol like the one Guevara admitted to carrying. Baldwin admitted that he failed to test fire the pistols, but testified unequivocally that his analysis was correct.

Williams's trial counsel, Loretta Muldrow, never sought an independent ballistics test or an independent autopsy or examination of the pathology report. Even after learning that Baldwin had not test fired the pistols in his examination of the ballistics evidence, Muldrow still did not request a continuance to have an independent expert further examine this evidence. Consequently, Baldwin's unrebutted testimony buttressed and gave credibility to Guevara's testimony that he was not Collier's killer. Indeed, throughout the State's

3

No. 10-20876

case, notably in closing argument, the prosecutor made much
of the fact that the jury did not need to decide which shot
killed Collier because the objective evidence showed that all
shots came from firearms attributable to Williams, not to
Guevara.

*Williams v. Quarterman*, 551 F.3d 352, 353–55 (5th Cir. 2008).  On July 26,
1995, Williams was convicted of capital murder and sentenced to death.  The
Texas Court of Criminal Appeals (CCA) affirmed the conviction on direct appeal.

Williams filed a state habeas application, in connection with which a state
trial court ordered the prosecution to release its ballistics evidence and
Guevara's .22-caliber pistol.  Before delivering the evidence to Williams' counsel,
the prosecution conducted its own tests which revealed that the Houston Police
Department had misidentified EB-1.  The post-trial test established that EB-1
was fired from a .22-caliber pistol (the same caliber as Guevara's weapon), not
a .25-caliber pistol (the same caliber as Williams' weapon).  Based upon those
results, Williams claimed that he was entitled to habeas relief under *Strickland
v. Washington*, 466 U.S. 668 (1984).  He argued that trial counsel's failure to
secure independent ballistics and pathology experts, who he argued would have
testified that EB-1 was fired from a .22-caliber weapon, constituted an
objectively deficient performance.  Williams further argued that he was
prejudiced by that lack of evidence, because it would have created doubt as to
whether he caused Collier's death.  *Ex parte Williams*, No.  634442-A (248th
Dist. Ct. 2001).

The state trial court held two evidentiary hearings.  Williams presented
the new ballistics evidence, including testimony from the Chief Criminalist of
the Tarrant County Medical Examiner's Office, Ronald Singer.  Ronald Singer
testified that Collier had suffered two wounds to the head, one inflicted by a .22-
caliber weapon, and one inflicted by a shotgun.  Singer stated that EB-1 was

4

easily identifiable as a bullet from a .22-caliber pistol, and that any competent examiner would have been able to identify it as such. *Id.*

Williams also presented testimony and affidavits of Dr. Marc Andrew Krouse, Deputy Chief Medical Examiner of the Tarrant County Medical Examiner's Office. Dr. Krouse examined the autopsy evidence and trial testimony and testified that EB-1 was itself highly likely to have caused death. He stated that he did not agree with the conclusion made at trial that the red margin around the bullet wound meant that Collier was alive when shot with the shotgun. Dr. Krouse concluded that it was impossible to tell in which order the firearm wounds had been inflicted, and that if he had performed the original autopsy he would have listed both wounds as causes of death. *Id.*

The prosecution presented the testimony of Smith, who was in the car during the shootings but was not present to testify at trial. Smith testified that he heard a pistol shot and then heard Collier yell "I'm hit," and that he saw Williams standing over Collier and pointing the shotgun at him. *Id.*

The state trial court found, *inter alia*, that Collier was alive when Williams shot him with the shotgun. But the state trial court nevertheless recommended that habeas relief be granted, finding that Williams had proven that trial counsel's failure to obtain independent experts constituted ineffective assistance under the *Strickland* standard. *Id.* The trial court reasoned that if trial counsel had sought out independent expert testimony, the evidence would have "changed the type and strength of cross-examination of Guevara . . . and much of the prosecution's closing argument" and that the jury "would have been presented with favorable and arguably exculpatory evidence." *Id.*

The CCA rejected the state trial court's recommendation in a two-page order, which stated in relevant part: "[W]e do not believe, based on our review of the record presented, that some of the crucial fact findings and the recommendation based, at least in part, on them, are supported by the evidence

presented at the evidentiary hearing. Accordingly, after a review of the record with respect to the allegations made by [Williams], and with due consideration of the recommendation made by the trial court, the relief sought is denied." *Ex parte Williams*, No. 46,736-02 (Tex. Crim. App. 2002) (per curiam).

Williams then brought a habeas petition in federal court, making the same *Strickland* claim, among others. The district court presumed the correctness of the factual findings issued by the state trial court, except insofar as those findings were inconsistent with the CCA's denial of state habeas relief. *Williams v. Dretke*, No. H-03-1508 (S.D. Tex. Mar. 29, 2005). The district court concluded that 22 U.S.C. 2254(d) precluded federal habeas relief with respect to the *Strickland* claim concerning omitted expert testimony. The district court issued a Certificate of Appealability with regard to the *Strickland* claim. *Id.*

This court reversed, holding that the district court erred in applying a presumption of correctness to the state-court findings of fact. *Williams v. Quarterman*, 551 F.3d 352, 358 (5th Cir. 2008) (Williams 1)  The case was remanded to the district court "for a full de novo evidentiary hearing of Williams's ineffective assistance of counsel claims on which the [COA] was granted." *Id.*

The district court held an evidentiary hearing at which two pathology experts testified. *Williams v. Thaler*, 756 F. Supp. 2d 809 (S.D. Tex. 2010). Williams called Dr. Krouse, who had previously testified on his behalf in the state habeas proceedings, and the Director called Dr. Vincent J. M. Di Maio. Dr. Krouse reiterated the findings that he reported in state court, and testified that the amount that Collier bled led him to conclude that Collier did not have blood pressure when he was shot with the shotgun. *Id.* at 822. On cross-examination, Dr. Krouse conceded that he could not definitively conclude whether Collier was alive at the time of the shotgun blast. *Id.* at 823. The prosecution's expert Dr. Maio testified that blood in the tissue surrounding the wound indicated that

No. 10-20876

Collier was alive when hit by the shotgun pellets, and that he would have listed EB-1 "as a finding" but not as a cause of death. *Id.* On cross-examination, Dr. Maio agreed that a .22 magnum "has a high potential for fatality if you're struck in the head with it." *Id.*

After reviewing the evidence, the district court found that trial counsel's failure to obtain expert testimony regarding ballistics and pathology constituted ineffective assistance of counsel under *Strickland.* The district court therefore granted Williams' habeas application. *Id.* at 828. This appeal followed.

## II.

Williams filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), therefore the requirements of the AEDPA apply. The AEDPA generally bars relitigation of claims that have already been adjudicated on the merits by a state court. 28 U.S.C. § 2254(d); *see Premo v. Moore*, 131 S. Ct. 733, 739 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). The statute provides three exceptions to the general relitigation bar. A petitioner may obtain federal habeas relief on a claim that has been litigated in state court if the petitioner can show that the state court's decision was contrary to a federal law that was clearly established in Supreme Court holdings, that the decision was an unreasonable application of such law, or that the decision was based on an unreasonable factual determination. 28 U.S.C. § 2254(d)(1)–(3); *see also Penry v. Johnson*, 543 U.S. 782, 792 (2001).

In reviewing a district court's grant of habeas relief, we review "for clear error with respect to findings of fact and *de novo* for issues of law." *Richardson v. Joslin*, 501 F.3d 415, 418 (5th Cir. 2007). The district court's application of AEDPA is a question of law and is therefore subject to *de novo* review. *Buntion v. Quarterman*, 524 F.3d 664, 670 (5th Cir. 2008).

## III.

7

No. 10-20876

As an initial matter, we turn to the precedent established by this court in *Williams v. Quarterman*, 551 F.3d 352 (5th Cir. 2008) ("*Williams I*"). In *Williams I*, we held that our precedents require an evidentiary hearing in the district court when a state appellate court issues a decision adopting some but not all of the trial court's findings, without specifying which it has adopted. *Id.* at 358-59. We now hold that subsequent Supreme Court precedent established in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), and *Harrington v. Richter*, 131 S. Ct. 770 (2011), undermines our holding in *Williams I*. In *Pinholster* the Supreme Court held that, because analysis under 2254(d)(1) requires a determination of whether a state-court decision was reasonable at the time it was made, "the record under review is limited to the record in existence at the same time." *Pinholster* at 1388. The Court went on to hold that "evidence introduced in federal court has no bearing on § 2254(d)(1) review," and that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at 1400. This holding precludes consideration of facts developed at a post-conviction federal district court evidentiary proceeding in the § 2254(d)(1) analysis.

Williams' *Strickland* claim was adjudicated on the merits in state court. Therefore under *Pinholster* the sole issue is whether the decision by the Texas Court of Criminal Appeals (CCA) was an "objectively unreasonable" application of the clearly established federal law concerning ineffective assistance of counsel. *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). As established by *Pinholster*, this is a "backward-looking" analysis, limiting itself to the record that was before the Texas CCA at the time of its decision.

Section 2254(d) "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (quoting *Renico*

*v. Lett*, 130 S. Ct. 1855, 1862 (2010)) (internal quotation marks omitted). As the Supreme Court recently held, the standard is meant to be difficult to meet. *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011).

Although the CCA provided no explanation for its reasoning in denying Williams' *Strickland* claim, that fact does not alter the highly deferential nature of the AEDPA standard. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784. In reviewing a state court habeas decision unsupported by explanation, a federal court must "determine what arguments or theories . . . could have supported the state court's decision," and then ask "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* at 786 (citing *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)).

The *Strickland* standard for ineffective assistance of counsel requires that the petitioner show both that counsel's "representation fell below an objective standard of reasonableness" and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694. Like AEDPA, *Strickland* establishes a deferential standard. *See Harrington* at 788 ("The standards created by *Strickland* and 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.") (internal citations and quotation marks omitted). Here, as in *Harrington*, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington* at 785. Williams must prove both that his counsel's performance was objectively deficient and that his counsel's deficiency prejudiced him, and that no reasonable jurist could conclude otherwise.

No. 10-20876

It is uncontested here that trial counsel's performance fell below an objective standard of reasonableness. Williams's counsel failed to obtain any independent ballistics or forensics experts, and was therefore unable to offer any meaningful challenge to the findings and conclusions of the state's experts, many of which proved to be incorrect.

Having concluded that Williams received ineffective assistance of counsel, the remaining question under *Strickland* is whether it is "reasonably likely" that the result of the trial would have been different if counsel had provided effective assistance. In order to determine whether the CCA reasonably concluded that the outcome would not have been different, we must examine the record that was before it. We have authority to issue the writ only if we conclude from this record that no fairminded jurist could agree with the CCA's determination. *Harrington*, 131 S. Ct. at 784.

The testimony at trial established that Williams went into the woods with Guevara, Collier, and Rasul. Winn testified that she was "certain" that Williams was carrying a shotgun he took from the car they arrived in, and that he was wearing a jacket that he used to conceal the shotgun. Williams was also carrying a .25-caliber pistol. After Guevara, Collier, Rasul and Williams entered the woods, numerous shots were fired. Williams fired his .25-caliber pistol, shooting Rasul in his foot. Collier was then shot in the face twice, once by a shotgun and once by a pistol. Later, the autopsy revealed both a small-caliber bullet and shotgun pellets in Collier's cranial cavity. While no eyewitness saw Williams shoot the shotgun, uncontroverted witness testimony established that he was the only person in the vicinity carrying a shotgun at the time.

The primary issue in this petition is whether trial counsel's failure to obtain expert reports was so prejudicial that every reasonable jurist would agree that this failure changed the outcome of the trial. Certainly the trial would have proceeded differently if Williams' counsel had obtained independent expert

10

No. 10-20876

reports. The state's expert incorrectly concluded that Williams fired the pistol round identified as EB-1 in addition to the shotgun pellets that were found in Collier's cranial cavity. This allowed the state to argue that because Williams fired both the shotgun and the pistol that delivered EB-1, it was irrelevant which shot caused Collier's death. Williams argues that if his counsel had called ballistic experts to testify that EB-1 was delivered by a .22-caliber pistol, the defense would have been able to argue that Guevara, not Williams, killed Collier.

But the fact that the new evidence would have given Williams a stronger defense or that the case would have been argued differently does not necessarily mean that the outcome would have been different. There was uncontradicted witness testimony[1] supporting the fact that Williams shot Collier in the face at close range with a shotgun. Dr. Brown, the medical examiner who performed the autopsy, testified at trial that Collier was alive when shot with the shotgun and that the shotgun, in his opinion, caused Collier's death. Had Williams been able to establish in the state habeas proceedings that Collier was already dead when he was shot with the shotgun, the CCA's determination may not have been reasonable. But Williams has never been able to produce definitive evidence that the pistol was fired before the shotgun. More importantly, Williams was unable to definitively refute Dr. Brown's trial testimony and establish that EB-1 independently caused Collier's death. In the state habeas proceeding, Williams submitted testimony from Dr. Krouse, a medical examiner, who concluded based on his review of the record that the pistol shot alone carried a high probability of fatality. But he could not state with certainty the order in which the shots were fired or whether either shot was the independent cause of Collier's death.

---

[1] Winn, Guevara, and Smith, all of whom were in the car with Williams, stated that when Williams left the car to go into the woods, he was carrying the shotgun. No one testified that anyone else possessed the shotgun.

11

No. 10-20876

The record reveals that the two opposing medical examiners were dealing with a very difficult and uncertain question: the role of the two gunshots delivered within seconds of one another in causing Collier's death.  Although Dr. Krouse's testimony in this regard was slightly more favorable to Williams than that of Dr. Brown, he was unable to say with any degree of certainty that the shotgun blast did not contribute to Collier's death.  Therefore it was not unreasonable for the CCA to conclude that, even if Williams's attorney had presented evidence showing that Williams did not also fire the pistol, it was not "reasonably likely" that the jury would have concluded that the shotgun blast was not responsible for Collier's death.  Keeping in mind the highly deferential standard imposed by the AEDPA, we cannot conclude that the CCA's denial of relief was unreasonable.

IV.

For the above reasons, we conclude that the CCA's decision was not an unreasonable application of clearly established federal law.  Accordingly, we REVERSE the district court's grant of habeas relief to Williams and RENDER judgment in favor of the director.

REVERSED and RENDERED.