## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-70010

REINALDO DENNES,

       Petitioner – Appellant

v.

LORIE DAVIS, Director, Texas Department of Criminal Justice,
Correctional Institutions Division,

       Respondent – Appellee

United States Court of Appeals
Fifth Circuit

**FILED**
January 6, 2020

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:14-CV-19

Before JONES, SMITH, and DENNIS, Circuit Judges.

EDITH H. JONES, Circuit Judge:*

Reinaldo Dennes ("Dennes"), a Texas death row inmate, seeks review of the district court's denial of his federal habeas petition. We granted a certificate of appealability ("COA") on his claims that the State wrongly suppressed impeachment evidence in violation of *Brady v. Maryland* and *Banks v. Dretke.* We AFFIRM the district court's denial of relief on those claims and DENY a COA on Dennes's challenges to the selection of two jurors.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-70010

## I. Background

On September 4, 1997, Dennes was convicted of capital murder and sentenced to death for the murder of Janos Szucs during the commission of a robbery.  The Texas Court of Criminal Appeals ("TCCA") affirmed his sentence and conviction on direct appeal.  *See Dennes v. State*, No. 72,966 (Tex. Crim. App. Jan. 5, 2000).  Dennes filed a state application for a writ of habeas corpus, which the TCCA denied based on the findings of fact and conclusions of law made by the trial court.  *See Ex Parte Dennes*, No. WR-34,627-02, 2013 WL 6673058 (Tex. Crim. App. Dec. 18, 2013).

Dennes then sought federal habeas relief on thirty-three grounds in the Southern District of Texas.  The district court denied habeas relief on all grounds and denied a COA, finding that "each of Dennes's claims" was "foreclosed by clear, binding precedent."  *Dennes v. Davis*, 2017 WL 1102697, at *17 (S.D. Tex. Mar. 22, 2017).  Dennes then sought a COA from this court, which we granted limited to the following three issues:

1. the claim that the state suppressed evidence that Balderas was a "long-time informant" for law enforcement in Harris County, Texas; and

2. the claim that the state suppressed evidence or denied due process by not timely revealing information about Balderas's, Fugon's, and Elvira's participation in the Tsang robbery; and

3. how petitioner satisfies the cause/prejudice standards for not having raised these issues in the state court.

The TCCA summarized the relevant facts of the crime in its opinion on direct appeal:

In December of 1995, Antonio Ramirez came from Ecuador to work in Texas.  Shortly after his arrival, Ramirez met a man

2

No. 17-70010

named Francisco Rojas who sold jewelry for [Dennes].[1] Some time later, Ramirez gave several rings to Rojas that he wanted to sell. Rojas then took Ramirez and the rings to [Dennes] at [Dennes]'s office in the Greenrich Building on Richmond Avenue. During this visit, Ramirez noticed a lathe in [Dennes]'s jewelry workshop and began to play with it. [Dennes] asked Ramirez if he knew how to operate the machine and Ramirez said that he did. [Dennis] then "hired" Ramirez to make watch bezels for him.[2]

Shortly thereafter [Dennes] invited Ramirez to travel to Mexico with him to buy a diamond. After the diamond purchase, the pair returned to Texas and [Dennes] gave Ramirez more work. In early January, 1996, [Dennes] made a sketch for Ramirez and asked him if he could make the object depicted. By the time he completed the job, Ramirez had manufactured what turned out to be a silencer for [Dennes]. After the silencer was completed, [Dennes], his brother Alberto, and Ramirez went to a field a few minutes away to test it. Thinking the silencer did not work as it should, [Dennes] modified his design and had Ramirez make another one. [Dennes] test fired this model in his office.

Shortly after the completion of the second silencer, [Dennes] asked Ramirez to help him and Alberto rob a jewelry dealer who also had an office in the Greenrich Building. [Dennes] explained that he would take the videotape from the security station while Ramirez secured the diamonds and Alberto shot the dealer. Ramirez consented, but returned to South America two days later.[3]

Estrella Martinez, [Dennes]'s lover, had a cleaning job at the Greenrich Building. In January of 1996, [Dennes] told Martinez he wanted her to let him in a side door of the building after working hours. He told her he was going to take some videotapes from the security guard's station on the first floor. On January 22, 1996, [Dennes] gave Martinez a cellular phone with which he planned to call her to tell her when to let him and Alberto into the building.

---

[1] [Dennes] ran a business called "Designs by Reinaldo."

[2] Ramirez stated that he did not expect to be paid for this work, but thought it would be a good thing to do while waiting to get money from the sale of his rings.

[3] Ramirez testified that he only consented so as not to alarm the Dennes brothers; however, he had no intention of helping them.

No. 17-70010

[Dennes] also wanted Martinez to distract the guard so he could take the tapes.

Janos Szucs was a reputable wholesale diamond dealer who had an office in the Greenrich Building. Shortly before his death, Szucs had a diamond inventory worth more than $3,600,000 which he kept in his office safe. He also had approximately $200,000 in cash that he planned to use to purchase diamonds on an upcoming trip. Szucs did not have a receptionist or secretary; access to his office was controlled through an electronically-locked door. Szucs had a television monitor in his office so he could see who was at the door and he would allow people in by pushing a remote button located on his desk. In early January 1996, Szucs and Sam Solomay formed a partnership and Solomay moved into Szucs's office suite.

On January 24th, Solomay left the office at 5:40 p.m., but Szucs remained, explaining that he had an appointment that evening. David Copeland was the security guard on duty at the Greenrich Building that evening, working the 3:00 p.m. to 11:00 p.m. shift. A videotape recorder at the security desk recorded the images from the security cameras around the building. When Copeland arrived for his shift, a technician was there working on the surveillance system.

Around 6:30 p.m. that same evening, [Dennes] called Martinez on the cellular phone he had provided her and told her to open the loading dock door. [Dennes] and Alberto entered and immediately turned into a stairwell, thereby avoiding the security guard's desk. Shortly after 7:00 p.m., [Dennes] called Martinez and told her to distract the security guard. Martinez told Copeland that she had locked her keys in a fifth floor office and asked him to help her retrieve them. A little after 7:30 p.m., [Dennes] again called Martinez and told her that he needed another distraction. The security guard kept the key to the snack bar so Martinez approached Copeland and told him that she needed to clean the area and asked if he would let her in. Shortly after Martinez began cleaning, however, the owner of the snack bar arrived and told her to come back later.

When Copeland returned to the lobby, he found a man kneeling behind the security desk apparently working on the security system. Copeland assumed this was related to the earlier repairs. As Copeland approached, the man scrambled to his feet and walked briskly toward the loading dock door. As Copeland neared

4

No. 17-70010

the security desk, the man turned and headed back toward the guard. When he reached Copeland, the man placed his left hand on Copeland's shoulder, stuck a .9 mm gun with a silencer to Copeland's chest with his other hand and fired. The man shot the guard again after he had fallen. As Copeland lay there playing dead, he heard the man walk to the security desk. He then heard equipment and wires being moved around followed by footsteps running toward the loading dock door.[4] The owner of the snack bar called "911."

Houston Police Officer Paul Terry arrived on the scene to find Copeland lying face down in the lobby. Copeland told Terry what had happened and the officer unsuccessfully searched for a suspect. Inside the lobby, Terry found spent shell casings and fragments of a fired bullet. He also noticed that the video equipment was missing.

That same evening, Szucs's wife, Nicole, became concerned that her husband had not arrived home. After several failed attempts to reach her husband, she received a call from a friend who worked in the Greenrich Building who told her that the building guard had been shot. Nicole asked the friend to contact the building's office manager. Sometime after 11:00 p.m., the building manager approached one of the officers remaining at the scene. Officer M.R. Furstenfeld and a couple of other officers then accompanied the manager to Szucs's suite to check on his welfare. Upon gaining access to the office, Furstenfeld found Szucs's dead body. Detectives who arrived at the scene noted no signs of a forced entry. They also noticed that the safe was empty and there were no signs of the $3.6 million dollar diamond inventory Szucs maintained or the $200,000 he was supposed to have on hand in cash. Plus, Szucs was not wearing the five-carat diamond pinky ring he always wore nor was the ring ever recovered.[5]     The

---

[4] As she walked toward the restrooms, Martinez looked into the lobby and saw a man in overalls approaching the guard with his hands behind his back. Martinez recognized this person as [Dennes] by his walk, but noted that he was wearing a mustache and some sort of disguise. Shortly after entering the bathroom, Martinez heard a strange sound. When she returned to the lobby, Martinez saw the guard lying on the floor bleeding.

[5] Nicole testified that her husband was wearing the ring that morning when she took him to work.

detectives also discovered that Szucs's computer had been damaged as if someone had tried to remove a disc with tweezers.[6]

The police eventually focused their investigation upon [Dennes]. A search of his office revealed a lathe that had been broken down and boxed up, a fired .9 mm bullet, and an owner's manual for a .9 mm Taurus handgun. Firearms examiner Robert Baldwin determined that the bullets recovered from Szucs's body, the bullet found in [Dennes]'s office, and the bullets found in the lobby of the Greenrich Building were all fired from the same gun. Moreover, the cartridge casings found in the lobby of the Greenrich Building and those found in the field where [Dennes] tested the silencer were fired from the same gun. The weapon was determined to be either a Taurus or a Beretta .9 mm handgun.

*Dennes*, slip op. at 2–7 (Tex. Crim. App. Jan. 5, 2000) (footnotes in original).

Evidence presented at the punishment phase of trial contributed to the jury's findings that it was probable that Dennes would commit acts of criminal violence constituting a continuing threat to society and that he caused and intended Szuc's death or anticipated that a human life would be taken. The jury was informed that Dennes had been placed on deferred adjudication for 180 days for indecent exposure.

Relevant here, and more important, Dennes was linked to another robbery that took place in 1995, within a few months of the Szucs murder. Specifically, Dennes had approached an acquaintance, David Balderas, to suggest robbing diamond courier Albert Ohayon, whom Dennes knew from past employment. Balderas testified that he acted as a middleman between Dennes and the perpetrators, Hector Fugon and Francisco Elvira, to carry out the 1995 robbery. Dennes's involvement was significant: he suggested that Balderas commit the robbery himself or find others to do so, met with Balderas, Fugon, and Elvira at a fast food restaurant to discuss the robbery; provided Balderas with the address and drove Balderas to the neighborhood to show

---

[6] Szucs kept his diamond inventory records on the computer.

him the house; and contacted Balderas when he learned the occupant was home.  As it turned out, Fugon and Elvira, at the direction of Balderas, mistakenly invaded the home belonging to Danny Tsang, not Albert Ohayon. They terrorized the Tsang family, took some jewelry, a watch, a camera, some clothing, a gun, and a stereo system, and fled in Tsang's car.  When the police checked on Ohayon the following day, they learned he was in the diamond wholesale business and had just returned from a trip with approximately $500,000 worth of diamonds.

## II.  Standards of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "our review [of Dennes's habeas petition] is limited by the COA." *Adekeye v. Davis*, 938 F.3d 678, 682 (5th Cir. 2019).  "COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone." *Id.* (citing *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997)). To merit a COA, a petitioner must "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Cockrell*, 537 U.S. 322, 338, 123 S. Ct. 1029, 1040 (2003) (internal quotation marks and citations omitted).

Further, under AEDPA, federal "court[s] may not grant habeas relief on a claim that a state court has adjudicated on the merits," *Harrison v. Quarterman*, 496 F.3d 419, 424 (5th Cir. 2007), unless the state courts' decision "was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."  28 U.S.C. § 2254(d)(2).  When assessing a denial of habeas relief, "we review the district court's findings of fact for clear error and its conclusions of law de novo." *Dorsey v. Stephens,* 720 F.3d 309, 314 (5th Cir. 2013).

No. 17-70010

## III. Discussion

### A. Brady Claims

With respect to the district court's denial of his *Brady* claims, Dennes contends the State suppressed material impeachment evidence that: (1) Balderas[7] was a police informant;[8] and (2) parts of Fugon's and Elvira's testimony at their separate trial impeached important aspects of Balderas's testimony concerning the Tsang robbery.[9]   Dennes also asserts that he can show cause and prejudice for his failure to present relevant facts in support of his *Brady* claim in state court.  Dennes contends that the State deliberately delayed disclosure of this impeachment evidence and suppressed critical information about the Tsang robbery, such that Dennes's counsel could not make effective use of the information at trial.[10]   The district court denied all of Dennes's *Brady* claims because "the bulk of the allegedly suppressed evidence was available to Dennes and was not suppressed within the meaning of *Brady*,"

[7] Balderas was called as a witness during the punishment phase and testified that he was never arrested or charged for the Tsang robbery, that he told prosecutors everything he knew about the Tsang robbery, and that he hoped to receive immunity for his role in the robbery in exchange for his testimony.

[8] Until Dennes petitioned this court for a COA, his claims regarding Balderas's status as a police informant focused on an undisclosed contractual arrangement between Harris County and Balderas in which the State dismissed two criminal charges against Balderas in exchange for his providing information unrelated to Dennes's case.  In his COA petition, Dennes placed much greater emphasis on his claim that Balderas had an "ongoing-informant relationship" with the State that lasted ten years and existed during Dennes's trial.  Neither the TCCA nor the district court addressed this point below.

[9] Specifically, Dennes argues that during their trial for the Tsang robbery, (1) Fugon and Elvira both failed to identify Dennes as being involved; (2) Fugon denied knowing Balderas and denied that Balderas was involved in the Tsang robbery; and (3) Elvira never identified Balderas or Dennes as being involved in the Tsang robbery.

[10] Specifically, Dennes argues that if his trial counsel had received timely advance notice of the Tsang robbery, "trial counsel could have moved for a continuance of Dennes's trial until exculpatory witnesses Fugon and Elvira no longer had a Fifth Amendment privilege against self-incrimination, after their appeals became final, and Dennes could then compel their exculpatory testimony."

8

Dennes "fail[ed] to demonstrate that the evidence was material;" and at least some of his allegations were procedurally barred for failure to exhaust state court remedies. *Dennes*, 2017 WL 1102697, at *6–7.

To establish a *Brady* violation, Dennes had to prove that (1) the prosecution actually suppressed evidence, (2) the suppressed evidence was favorable to him, and (3) the suppressed evidence is material. *See Kyles v. Whitley*, 514 U.S. 419, 433–34, 115 S. Ct. 1555, 1565–66 (1995); *see also Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 1948 (1999) ("The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."). Evidence is considered material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.*; *see also United States v. Sipe*, 388 F.3d 471, 485 (5th Cir. 2004). But if the suppressed evidence was discoverable through due diligence, a petitioner's *Brady* claim necessarily fails. *United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011), *cert. denied*, 566 U.S. 970, 132 S. Ct. 1969 (2012).

### 1. Evidence Concerning Balderas's Status as a Police Informant

In his motion for a new trial in state court, Dennes alleged that Balderas's status as a police informant was material impeachment evidence that had been suppressed from the defense. Specifically, Dennes asserted that the state failed to disclose a contractual arrangement with Harris County involving different criminal offenses from those in Dennes's case, and that the state had dismissed two criminal charges against Balderas in exchange for his

providing information also unrelated to Dennes's case.  The deal allegedly prompted Balderas to testify falsely against Dennes.

The state courts rejected these contentions.  The state trial court evaluated the evidence of dealings between Harris County and Balderas and concluded it did not see "the relevancy at all with regard to the trial of [Dennes's] case or the testimony of anybody that has provided any evidence in [Dennes's] case regarding the effect of these documents on [Balderas's] testimony."  Indeed, the trial court emphasized that because the contract involved wholly different offenses and the parties had fulfilled their contractual obligations months before Dennes's trial began, this evidence provided no incentive for Balderas to taint his testimony in favor of the State.  The TCCA agreed, holding, "As [Balderas] had no relation to the instant case and the contract was completed before the trial in [Dennes's] case, [Dennes] fails to show there was a reasonable probability the outcome of the trial would have been different."

The district court also agreed that the completed contract between Harris County and Balderas was not impeachment material because it provided no reason for Balderas to fabricate his testimony against Dennes.  *See Dennes*, 2017 WL 1102697, at *6.

In his brief to this court, Dennes argues that the information about these dealings is material because it shows a relationship between Balderas and the State, which he analogizes to the relationship between the sheriff's office and the informant who was a star witness at the Banks capital murder trial.  *Banks v. Dretke*, 540 U.S. 668, 693–94, 124 S. Ct. 1256, 1273–74 (2004).  In *Banks,* the Supreme Court held that a *Brady* violation had occurred where the prosecution failed to turn over evidence of a money payment to the testifying informant *for his involvement in the case against defendant Banks.*  540 U.S. at 685, 124 S. Ct. at 1269.  *Banks* is distinguishable, among other reasons,

because the arrangement between Balderas and Harris County existed prior to and wholly independent of the case against Dennes.[11]  And the *Bagley* case is distinguishable because there, the witness received a benefit from testifying, whereas Balderas received none in this case.  *Bagley*, 473 U.S. at 671–72, 105 S. Ct. at 3378–79 (1985).  As to this element of the claim, which was exhausted in the state courts, the TCCA did not unreasonably apply governing Supreme Court law by denying relief.

Dennes also seeks to enhance his *Brady* claim by asserting that the State failed to disclose that Balderas was an ongoing informant for Harris County from at least 1989 through 1999, two years after Dennes's trial.  Dennes raised this argument about Balderas's ongoing informant status for the first time in his petition for a COA from this court.  Dennes makes three claims based on this allegation:  1) at trial, the State falsely represented that Balderas was not an ongoing informant at the time of Dennes's trial; 2) this was valuable impeachment evidence that *Brady* compelled the state to provide the defense and which could have been used to attack Balderas's credibility under *Davis v. Alaska*, 415 U.S. 308 (1974); and 3) the State trial court suggested it may have ruled differently "if there was an ongoing relationship."

Several procedural hurdles must be overcome for Dennes to succeed on this argument.  The evidence in support of his contention that Balderas was an ongoing informant for the State derives from statements made by Balderas's attorney in a federal court sentencing hearing in 1999, the transcript of which was never presented to the state courts. Federal courts are precluded, absent limited circumstances, from considering evidence in habeas

---

[11] Dennes's related claim, raised for the first time in federal court, that Balderas's drug charges were dismissed as consideration for his testimony in Dennes's case, is not only entirely speculative but is procedurally barred because he failed to present the claim to the TCCA for review on either direct appeal or in his state habeas application, as recognized by the district court.  *See* 28 U.S.C. § 2254(b)(1); *Dennes*, 2017 WL 1102697, at *6–7.

proceedings that was not produced before the state courts for adjudication on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 185, 131 S. Ct. 1388, 1400–01 (2011). On that basis alone, this claim fails. But to the extent that Dennes raises this as a standalone *Brady* claim, it is also procedurally barred by not having been raised at all in the state courts. *See* 28 U.S.C. § 2254(b)(1).

Dennes attempts to show cause and prejudice as a means to overcome the procedural bar against his unexhausted claim and to avoid AEDPA's limitation on federal courts' review to evidence developed in state court records. Dennes relies on *Banks* for the proposition that a petitioner can overcome a procedural bar to a *Brady* claim if suppression of material exculpatory evidence caused the default. *Banks*, 540 U.S. at 691, 124 S. Ct. at 1272.

Cause, in this context, means that the State prevented Dennes from gaining access to the relevant *Brady* information. "[A] petitioner shows 'cause' if 'the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence.'" *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018) (quoting *Banks*, 540 U.S. at 691, 124 S. Ct. at 1272). Dennes claims he was not aware of Balderas's alleged longstanding status as an informant for Harris County because the State withheld the information. But evidence is not suppressed under *Brady* if the defendant knew or should have known of Balderas's status. Here, there is ample evidence to suggest that, at minimum, Dennes should have known about Balderas's status.

At the motion for new trial hearing, Dennes's counsel argued that Balderas "had a working relation and we believe the documents speak of an *ongoing working relationship* with the State of Texas out of which he received a dismissal of a major drug case . . . that relationship with the State and his desire to work with the state in order to secure dismissal of the case . . . should have been disclosed under *Brady*." During the course of these proceedings, the

State also turned over Balderas's informant contract to the trial court and acknowledged his informant relationship with the State. And, as if this evidence were not enough, Dennes's counsel proffered the testimony of Balderas's attorney, John Munier, who was present at the motion for new trial hearing and was willing to testify about Balderas's informant relationship with the State.[12] Taken together, these points establish that Dennes had, if not actual knowledge, sufficient opportunity to learn of Balderas's status by the conclusion of the motion for new trial hearing.

Dennes claims, however, he first learned of Balderas's status from the transcript of Balderas's 1999 sentencing hearing. But supposing this is true, the TCCA did not decide his direct appeal until Jan. 5, 2000, and his state habeas appeal remained pending until 2013. *Dennes v. Davis*, 2017 WL 1102697, at *3 (S.D. Tex. Mar. 22, 2017). Thus, since Dennes should have been aware during state court proceedings, he could have supplemented his brief or raised this suppression issue in state courts before filing his federal habeas petition.[13]

Even assuming *arguendo* that Dennes's long-term informant status was "suppressed," it is not material. "Unless suppressed evidence is material for *Brady* purposes, [its] suppression [does] not give rise to sufficient prejudice to

---

[12] John Munier was Balderas's attorney who also later handled Balderas's 1999 sentencing hearing, the transcript of which allegedly notified Dennes of Balderas's ongoing relationship with the State.

[13] Dennes claims that he could not have raised this suppression issue in state habeas proceedings because the TCCA would have treated an amendment to his habeas application as a successor petition. But if the 1999 hearing did reveal new and suppressed information, then it would have satisfied the successor petition standard that the "current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application[.]" *E.g.* TEX. CODE CRIM. PROC. ANN. ART. 11.071 § 5(a)(1) (West 2003).

overcome [a] procedural default." *Banks*, 540 U.S. at 698, 124 S. Ct. at 1276 (quotation marks and citations omitted).  The test for materiality and prejudice is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 124 S. Ct. at 1276; *Banks*, 540 U.S. at 698, 124 S. Ct. at 1276; *Strickler*, 527 U.S. at 280, 119 S. Ct. at 1948.  Balderas's conflict of interest had already been made glaringly obvious to the jury.  At the time of Dennes's trial, Balderas had not received an official offer of immunity in exchange for his testimony, and Dennes's counsel drew significant attention to this fact.  Additionally, and contrary to the narrative Dennes attempts to craft suggesting that Balderas willingly helped the prosecution, Balderas testified that the prosecution subpoenaed his testimony.  That Balderas was involuntarily "drug" into court suggests he did not take the stand pursuant to an ongoing relationship with the State.  Moreover, Munier's testimony at the 1999 sentencing hearing affirmed that Balderas received no benefit for his testimony.

Evidence of Balderas's long-time informant status would have been, at best, cumulative proof of bias.  But cumulative impeachment is not material.  "Undisclosed evidence that is merely cumulative of other evidence is not material[.]" *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010); *see Canales v. Stephens*, 765 F.3d 551, 575–76 (5th Cir. 2014) (finding that suppressed evidence of inmate-witnesses receiving assistance with their housing and parole issues in exchange for testimony was not prejudicial because "the jury heard at least some of this information at trial," as "Canales's attorney at least asked some inmate-witnesses about being encouraged to help the State in exchange for benefits"); *see also Felder v. Johnson*, 180 F.3d 206, 213 (5th Cir. 1999) (citing *United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996) ("Suppressed evidence is not material when it merely furnishes an additional

basis on which to impeach a witness whose credibility has already been shown to be questionable.")).

Additionally, circumstantial evidence strongly corroborates Balderas's testimony. "[T]he impeached testimony of a witness whose account is strongly corroborated by additional evidence supporting a guilty verdict . . . generally is not found to be material[.]" *Rocha,* 619 F.3d at 396–97 (quotation marks omitted); *see also Kopycinski v. Scott,* 64 F.3d 223, 226 (5th Cir. 1995) (finding that a witness leading police to the decedent's body was corroborative of his testimony that the defendant had murdered the decedent such that "leading the police to the body essentially makes his testimony unimpeachable").

The Tsang home invasion was undertaken for jewelry, as shown by Fugon and Elvira's repeated demands for diamonds. Albert Ohayon and his wife, Rachel, the likely intended targets of the robbery, lived just a few doors away. Ohayon was a diamond salesman who had just returned to Houston with approximately $500,000 worth of diamonds in his briefcase. Ms. Ohayon testified that she knew Dennes from her work in the diamond business, and that Dennes and her husband had worked for the same company, albeit at different times. MGI, Ms. Ohayon's former place of employment, and Szucs Jewelry were both subsidiary companies of Satler's Jewelry, where Dennes had worked.

Neither Balderas, Fugon, nor Elvira would have had any reason to know where a diamond wholesaler lived. Balderas, for example, was an automobile body shop worker. Moreover, both robberies occurred close in time,[14] both were planned robberies of diamond wholesalers, and both were connected to the company Dennes had previously worked for. Such evidence makes it unlikely that a jury would have found Balderas to be any less credible based on his

---

[14] The Tsang home invasion occurred on November 15, 1995. Szucs's robbery and murder took place just over two months later, on January 24, 1996.

alleged informant status on unrelated matters.  Once again, Dennes is unable to show materiality or prejudice.

Finally, several of Dennes's extreme claims about Balderas's "false" testimony simply do not square with the record.  Dennes claims that the prosecution falsely presented Balderas as an honest witness who came forward of his own volition with information about the Tsang robbery and received nothing but immunity in exchange for his participation.  Yet Dennes offers nothing except naked speculation to suggest this narrative is untrue.  For example, Dennes asserts that Balderas lied when he testified that he "voluntarily" approached his brother-in-law, a Houston Police Department ("HPD") homicide detective, with information about the Tsang home invasion.  In support, Dennes points to Balderas's arrest for felony possession of marijuana the same month he discussed the Tsang home invasion with the HPD.  Besides the sequence of events, however, Dennes offers no evidence that there was a *quid pro quo*, the drug charges were dropped pursuant to a contract that concluded prior to his testimony Dennes's trial, and Dennes ignores that Balderas's testimony was subpoenaed.  As another example, Dennes argues that the prosecution lied about their intent to use Balderas as a witness.  Not only did the prosecution not have to disclose its witnesses or strategy at the January 1997 pre-trial hearing, Dennes offers no evidence that raising the Tsang home invasion or calling Balderas as a witness were definitive parts of the State's strategy at that point.  The State counters that there was no intent to call Balderas until Fugon invoked his Fifth Amendment privilege and was unavailable to testify while his conviction was pending on direct appeal.  This is corroborated by Officer Miller's 1996 letter indicating that he intended to focus on securing Fugon's testimony against Dennes.

Dennes raises these claims of "false" testimony to avail himself of the more lenient standard to establish prejudice under *Giglio v. United States*,

405 U.S. 150, 154, 92 S. Ct. 763, 766 (1972) ("A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . ..") (internal quotation marks and citations omitted).  But, as pointed out above, the allegations that the State knowingly used "false" testimony are dubious at best and largely foreclosed by the record.  In *Giglio*, a key witness testified that he believed he could still be prosecuted for a crime even though the State had granted him immunity in exchange for his testimony.  *Id.* at 151–52, 765.  The prosecution's failure to correct this blatantly false testimony led the Supreme Court to remand for a new trial.  Dennes has not shown that anything approximating that level of false testimony occurred during his trial, and he is therefore held to the stricter materiality standards under *Brady*.  Accordingly, Dennes has failed to show cause or prejudice to overcome the procedural barriers to his claims.

### 2.  Evidence Concerning Fugon's and Elvira's Testimony

Dennes's remaining *Brady* claims assert that the State failed to disclose until immediately before trial that the Tsang robbery would be offered as evidence of extraneous crimes during any punishment phase.  Specifically, Dennes claims that the robbers' testimony at their trial for the Tsang home invasion was known by the Harris County District Attorneys who were handling that case,[15] but that the State did not disclose Fugon's name or his role in the crime until August 13, 1997, five days before the beginning of testimony at the guilt phase of Dennes's case on August 18.  Dennes asserts his counsel had insufficient time to ascertain that both Fugon and Elvira had

---

[15] Balderas offers a letter from 1996 that was faxed from an investigator in the Dennes case to a then-prosecutor of Dennes regarding the investigator's discussions with Fugon, Elvira, and Balderas.  Because this letter does not appear to have been introduced in the state courts, this court is prohibited from considering it.  *Pinholster,* 563 U.S. at 185, 131 S. Ct. at 1400–01.

testified that they did not know Balderas and that they could not identify Dennes as an instigator of the Tsang robbery.[16]  Consequently, Dennes was deprived of further impeachment evidence against Balderas, the only witness presented by the State concerning Dennes's involvement in the Tsang robbery. Dennes further argues that his federal habeas counsel only located Fugon's testimony after "several months" because the State allegedly failed to provide Dennes's trial counsel with Fugon's and Elvira's transcripts with enough time to "make meaningful use of the impeachment information."

As with the late-breaking claims about Balderas's status as a long-term police informant, the evidence of Fugon's and Elvira's testimony at the Tsang robbery trial was not raised in the state courts and is therefore not amenable to our consideration.  *Pinholster*, 563 U.S. at 185, 131 S. Ct. at 1400–01.[17]

In addition, the district court, ruling on the merits, observed that most of this additional information originated from Fugon's trial, and thus "the bulk of the allegedly suppressed evidence was available to Dennes."  *Dennes*, 2017 WL 1102697, at *6.

We agree that this evidence became available to Dennes at least in sufficient time for him to have used it in state court proceedings.  The Tsang trial occurred almost a year before Dennes's capital murder trial.  Fugon's and Elvira's convictions were on appeal at the time of Dennes's capital murder trial.  Dennes had been informed in early 1996 of the State's plan to introduce evidence of his connection to an extraneous home invasion robbery.   His

---

[16] Dennes posed the timing issue in various ways in the state courts and was rebuffed. To the extent that the timing ultimately raised only issues of state law, no federal constitutional claims are involved.

[17] Dennes's contention that his federal habeas counsel had to pry out the trial testimony of Fugon and Elvira over "several months" rings hollow in light of the timing of their trial in 1996 and the fact that the TCCA did not issue its ruling on Dennes's direct appeal until January 5, 2000.

counsel was given access to the HPD offense reports about the robbery, which revealed the perpetrators' identities, before the beginning of the punishment phase when the evidence of the Tsang robbery was introduced. Most important for present purposes, even if, as counsel asserts, Dennes did not have timely access to the Fugon/Elvira trial transcript during his own trial, the transcript was certainly available during the over-two-year interlude between Dennes's conviction and the rendering of the TCCA opinion affirming his conviction in 2000. The State has no obligation to provide exculpatory or impeachment evidence that is available to the defense through the exercise of due diligence. *See Rector v. Johnson*, 120 F.3d 551, 558–59 (5th Cir. 1997); *see also Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002) ("*Brady* does not obligate the State to furnish a defendant with exculpatory evidence that is fully available to the defendant through the exercise of reasonable diligence."). The transcript was not suppressed during state court proceedings, yet Dennes never sought to offer it until his federal habeas petition. As a result, this claim is also unexhausted and procedurally barred from review in federal court. 28 U.S.C. Sec. 2254(b)(1).

## B. Jury Selection Claims

Dennes also seeks a COA based on a claim that the trial court violated his Sixth and Fourteenth Amendment right to be tried by an impartial jury by denying his challenges for cause to two prospective jurors. Dennes contends that two venire members, Richard Miller and Martha Jean Gutierrez, were biased and that challenges for cause should have been granted as to both because their views would prevent or substantially impair the performance of their duties as jurors in accordance with their oaths. Dennes argues that the trial court erroneously required him to exercise his peremptory strikes to remove those jurors, and he was denied effective use of additional peremptory strikes whereby he would have removed two other allegedly biased jurors,

Irene B. Collins and Belle Symmank.  The TCCA rejected this claim on the basis of state law.

The district court assumed *arguendo* that Miller and Gutierrez should have been removed for cause according to federal constitutional law, but because the record reflected that the trial court granted Dennes two additional peremptory strikes, after which both parties "promptly accepted the next juror on the list as the twelfth juror," Dennes failed to make any showing "that any of the jurors, including the alternates, were not impartial."  *Dennes*, 2017 WL 1102697, at *12.  The court reasoned that "[a]t most, Dennes was forced to accept an alternate juror who he would have challenged if he had an additional peremptory challenge," and thereby failed to demonstrate a Sixth Amendment violation.  *Id.*

The Sixth and Fourteenth Amendments guarantee an accused the right to a trial by an impartial jury, but the forced use of a peremptory challenge does not rise to the level of a constitutional violation.  *See Ross v. Oklahoma*, 487 U.S. 81, 85–88, 108 S. Ct. 2273, 2277–78 (1988).  Rather, a "district court's erroneous refusal to grant a defendant's challenge for cause is only grounds for reversal if the defendant establishes that the jury which actually sat to decide his guilt or innocence was not impartial."  *United States v. Snarr*, 704 F.3d 368, 386 (5th Cir. 2013) (internal quotation marks and citation omitted); *see also Jones v. Dretke*, 375 F.3d 352, 355 (5th Cir. 2004) ("As a general rule, a trial court's erroneous venire rulings do not constitute reversible constitutional error 'so long as the jury that sits is impartial.'" (internal citation omitted)).

Even assuming that the trial court should have granted Dennes's challenges for cause, Dennes cannot establish a constitutional violation because he used peremptory strikes to exclude both Miller and Gutierrez from the jury.  *See Ross*, 487 U.S. at 85–88, 108 S. Ct. at 2277–78.  Therefore, "[a]ny claim that the jury was not impartial . . . must focus not on [Miller and

Gutierrez], but on the jurors who ultimately sat." *Id.* at 86, 108 S. Ct. at 2277. Although Dennes asserts that Collins and Symmank were actually biased jurors who sat on his guilt-innocence and punishment phases of trial, he fails to identify how or why they were biased or why his counsel did not use peremptory strikes to remove them. Accordingly, there was no constitutional violation because the challenged jurors were removed from the jury by Dennes's use of peremptory challenges and Dennes cannot establish that he was sentenced by a partial jury. *Id.* Reasonable jurists would not debate the district court's application of the law governing juror selection and peremptory strikes in capital trials to the decisions made by the state courts.

## IV. Conclusion

For the above-stated reasons, we **AFFIRM** the district court's denial of Dennes's federal habeas petition insofar as it raises *Brady* issues and **DENY COA** on the jury selection issues.